## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## LOS ANGELES NEW HOSPITAL, Respondent.

No. 80–7073.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 1980.

Decided March 6, 1981.

Susan L. Dolin, Richard M. Fischl, Washington, D.C., for petitioner.

Catherine Hagen, O'Melveny & Myers, Los Angeles, Cal., for respondent.

Before WRIGHT and TANG, Circuit Judges, and HANSON,* Senior District Judge.

HANSON, Senior District Judge:

The National Labor Relations Board (Board) found that the Los Angeles New Hospital (Hospital) had interrogated and threatened its employees and created the impression that their protected union-organizing activities were under surveillance, all in violation of § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (Act). The Board applies to this Court for

enforcement of its September 11, 1979, order directing the Hospital to cease and desist from the unfair labor practices and to post an appropriate notice. We conclude that the Board's order should be enforced.

I.

On May 30, 1978, the Hospital announced that it was changing its sick leave policy so that effective June 5, 1978, employees would no longer be paid for their first day of sick leave. Employees Richard Fox and Richard Hopkins began soliciting other employees to sign a petition protesting the policy change. After organizing the petition drive, Fox and Hopkins approached Hospital administrator Jeffery Steadman and asked him to arrange a meeting at which they might present the petition to Stanley Diller, Hospital president and chairman of the board. The meeting was arranged and Fox and Hopkins presented the petition to Diller. At this meeting, the possibility of forming a hospital grievance committee was discussed. The committee—composed entirely of employees—was formed and it met a few days later in a seventh floor classroom of the Hospital, with management's knowledge and permission. At the grievance committee meeting, discussion turned from specific grievances to unionization, and an organizational meeting was arranged.

On June 19, 1978, a number of hospital employees met with representatives of the Hospital and Service Employees Union, Local 399. The Hospital activities challenged in this proceeding took place before and after the June 19 meeting. We discuss these in more detail below under separate headings, in connection with our review of the Board's separate findings and conclusions.

In reviewing the Board's decision and order, we are mindful that "The judicial role is narrow: The rule which the Board adopts is judicially reviewable for consistency with the Act, and for rationality, but if it satis-

* The Honorable William C. Hanson, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

-fies those criteria, the Board's application of the rule, if supported by substantial evidence on the record as a whole, must be enforced." *Beth Israel Hospital v. NLRB,* 437 U.S. 483, 501, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978).

## II.

### A. *Interrogation of Employees Fox and Myles.*

1. At the hearing before the Administrative Law Judge (ALJ), employee Richard Fox, a pathologist assistant, testified that Diller approached him while he was in the hospital cafeteria distributing memos that publicized the June 19 union meeting. Diller asked for one of the memos and after reading it, told Fox that he "felt [Fox] was working too hard in the matter." Fox also testified that, on the day of the union meeting, Diller told him "something to the effect that a union would never survive in that hospital and that we were fools and troublemakers for trying to bring one in." Diller also asked Fox for the names of persons who were on the committee. Fox divulged the names, and later, committee members Richard Hopkins and Theresa Siminski told Fox that Diller had called them to his office and questioned them. Also on the day of the union meeting, Fox spoke to Administrator Steadman. Steadman said that he "felt sorry for [Fox] because [he] was under a lot of pressure and that [Fox] had to watch every move [he] made because Mr. Diller was watching [him]." Finally, a couple of weeks after the union meeting, Fox encountered Diller. Fox told him that his involvement in union activities was over. Diller replied, "That's good, because [I'm] still watching [you]." The ALJ credited the testimony of Fox because Steadman's testimony was too "vague and uncertain" to credit and because Diller did not testify at the hearing. The ALJ found that the statements by Diller and Steadman were "derogatory and repressive antiunion comments," and thus § 8(a)(1) had been violated. But, according to the ALJ, the statements failed to indicate that the Hospital had engaged in surveillance of its employees or created the impression that the employees were under surveillance, as alleged in the Complaint filed by the Regional Director. The Board agreed that § 8(a)(1) had been violated, but substituted its own finding that the comments amounted to threats of reprisal, and further created the impression that Fox's union and other protected concerted activities were under surveillance.

2. Jacqueline Myles, a secretary in the engineering department, was asked by Diller on the day after the union meeting whether she had attended that meeting. Diller also asked her for the names of those people in her department who attended. In a separate incident in late September of 1978, Myles was transferred at her request from engineering to the X-ray department. The day after her transfer, Myles's replacement in engineering quit and she was transferred back to her old department. Myles went to Assistant Administrator Sy Zafrani to protest. During their conversation, Zafrani asked her, "How do you feel about the Union?" Myles's testimony was credited because neither Diller nor Zafrani testified at the hearing. The Board upheld the ALJ's finding that the questioning of Myles by Diller and Zafrani was in violation of § 8(a)(1).

3. Interrogation of employees by the employer violates Section 8(a)(1) when that interrogation carries a threat of reprisal against the employee or when it forms a pattern of coercive conduct tending to inhibit the exercise of Section 7 rights. *NLRB v. Silver Spur Casino,* 623 F.2d 571, 584 (9th Cir. 1980), *pet. for cert. docketed,* No. 80–660 (filed Oct. 11, 1980). "[T]he test is whether, under all the circumstances, the interrogation reasonably tends to restrain or interfere with employees in the exercise of their protected rights." *Penasquitos Village, Inc. v. NLRB,* 565 F.2d 1074, 1080 (9th Cir. 1977).

In this case the record amply supports the Board's conclusion that both Fox and Myles were subjected to coercive interrogation by superiors. We note that neither Fox nor Myles was assured by the interrogators that no reprisals would be taken against them.

In addition, Diller and Zafrani failed to communicate to the employees whether they had a valid purpose for asking the questions. And finally, Diller, who held the highest position in the hospital management hierarchy, asked both employees specifically for names of individuals who were involved in the organizational activities, reasonably creating an impression that he sought information upon which to base actions against individual employees. All of the aforementioned factors are relevant in weighing the lawfulness of interrogations by management. *See NLRB v. Ayer Lar Sanitarium,* 436 F.2d 45, 49 (9th Cir. 1970), *citing NLRB v. Varo, Inc.,* 425 F.2d 293, 298 (5th Cir. 1970). Finding substantial evidence on the record as a whole, we uphold the Board's decision as it relates to the interrogation of these two employees.

B. *Solicitation by Employee James Cooke.*

1. Anesthesia technician James Cooke testified that during the first week of July 1978, he was reading union literature to three other employees during his break time in a break room or lounge that was adjacent to the operating room. He was told by his supervisor, Ora Randall, that he was not supposed to have the literature in that area. According to Cooke, Randall stated that the room was not really a break room and that Cooke was not on a scheduled break. When Cooke continued to read the literature, Randall called him into her office and repeated that he was not on a scheduled break, that he was not supposed to have union literature in that particular room, and that he could be replaced for having the literature there. Randall testified that the area where Cooke was soliciting was not a lounge area, but rather part of the operating room. The ALJ, however, credited Cooke's testimony that the room was used by employees as a break room and that Cooke was in this break room at a time when he customarily took his break. The Board adopted the ALJ's conclusion that Randall prohibited Cooke from discussing unionism on his break time and threatened that he could be replaced for having union

literature in the lounge area, both in violation of § 8(a)(1).

2. The general Board policy regarding solicitation in hospitals is that "solicitation on nonwork time may be prohibited only where necessary to avoid disruption of patient care or disturbance of patients." *NLRB v. Baptist Hospital, Inc.,* 442 U.S. 773, 99 S.Ct. 2598, 2603, 61 L.Ed.2d 251 (1979). Thus, proscriptions against solicitation in "immediate patient-care areas" are not regarded as presumptively invalid. *Beth Israel Hospital v. NLRB,* 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978). But in areas other than immediate patient-care areas, such proscriptions are presumptively invalid; and if they are to be sustained it is incumbent upon the Hospital to show that "disruption to patient care would necessarily result if solicitation and distribution were permitted in those areas." *Id.,* at 495, 98 S.Ct. at 2470. In addition, we recognize that it is the Board's function to develop presumptions and "its conclusions on such matters are traditionally accorded considerable deference." *Baptist Hospital, supra,* 99 S.Ct. at 2611 (Brennan, J. concurring).

In *Baptist Hospital,* the Court held that substantial evidence supported the Hospital's position that solicitation in corridors and sitting rooms on patients' floors tended to disrupt patient care and disturb patients, justifying a ban on solicitation in those areas: "Small public rooms or sitting areas on the patient-care floors, as well as the corridors themselves, provide places for patients to visit with family and friends, as well as for doctors to confer with patients' families—often during times of crisis." 99 S.Ct. at 2604–05.

In the instant case, the controversy turns on the characterization of the room in which Cooke was soliciting. The Hospital argues that the area in question was a "sitting room" on a patient-care floor and thus it was permissible for Randall to prohibit Cooke from soliciting there and to threaten that he could be replaced for so soliciting.

The room in question is adjacent to the operating room on the second floor of the Hospital. There are four doors in the room. One door opens onto the second floor's main corridor. Approximately twenty feet away from this main door, at the opposite end of the room, are two doors which lead respectively to the doctors' and nurses' dressing rooms. Also on this end of the room is a narrow hallway, approximately fifteen feet long. At the end of the hallway is the room's fourth door; this door leads to the outer portion of the operating room area where there are patients waiting to go into surgery. The dimensions of the room itself, not including the hallway that leads to the operating rooms, are approximately ten feet by twenty feet. No patients ever enter the area in question; it is never used as a passageway through which to transport patients to and from the operating room, nor is it ever used as a holding area for patients awaiting or recovering from surgery. Patient access to the operating room is through double doors that connect the operating room area directly to the main corridor. The room in question is furnished with a couch and two chairs. There is also a bulletin board on the wall. It was undisputed that employees regularly eat and drink in the room. Cooke testified that he has seen as many as fifteen people at one time in this room and that it is used as a lounge by thirty people from two different departments. But the ALJ rejected Randall's testimony that the room is part of the operating room (and thus an "immediate patient care area"), finding that

> Although Ora Randall's testimony sought to establish the "lounge" area as a part of the operating room—and thus not a permissible place to engage in union conversation—the evidence overwhelmingly refutes her testimony. One doesn't regularly eat lunch, drink cokes and coffee, and engage in social conversation in an

operating room. That these things were done in the "lounge" area where James Cooke was "selling" the Union's cause is undenied.

■ The Board agreed that the room is indeed a lounge; it noted that in fact there was once a sign on the door leading into the room designating it as the "Doctor's Lounge." In addition, the Board indicated that the presence of a bulletin board in the room reinforced the conclusion that the room is a lounge for Hospital employees,[1] and therefore a permissible place to solicit support for the Union. Although the room is not generally accessible to visitors and patients, doctors occasionally confer with patients' relatives in the room. There is, however, a separate waiting room on the second floor for the use of visitors. Substantial evidence on the record supports the Board's conclusion that the area in question is neither part of the operating room, nor a public sitting room; it is a lounge for the use of hospital employees during their non-work time.

Since the area where Cooke was soliciting is not an immediate patient care area, the burden rests on the Hospital to show that Randall's complete prohibition was necessary to prevent disruption of patient care. *Beth Israel, supra,* 437 U.S. at 495, 98 S.Ct. at 2470. Randall testified that before the incident with Cooke she was attending to a patient who was awaiting surgery in the operating room area—the area that is connected to the lounge by the fifteen-foot long corridor. A nurse asked Randall if she had seen Cooke because some supplies for which he was responsible could not be located. Randall looked for Cooke in the anesthesia room, but he was not there so she located the supplies herself. She then found Cooke, who was on his break, in the lounge reading union literature to three other employees. According to the credited testimony of Cooke, Randall told him that

---

1. The presence of a bulletin board in the hospital cafeteria in the *Beth Israel* case served as one indication to the Court that the cafeteria was used for solicitation and distribution of other types of communications unrelated to union activity. As such, the cafeteria was held by the Court to be a permissible venue within the hospital for solicitation and distribution of union literature. *Beth Israel Hospital v. NLRB,* 437 U.S. 483, 490, 98 S.Ct. 2463, 2468, 57 L.Ed.2d 370 (1977).

he was not supposed to have union literature in the lounge. Cooke replied that he was on his break. Randall then returned to the operating room area where she had been before. She stated that she was aware of noise coming from the lounge. It was at this point that she returned to the lounge, told Cooke to come to her office, and then directed him to stop soliciting. This isolated incident is insufficient to show that "disruption to patient care would necessarily result" in the absence of a complete ban on solicitation in the lounge. *Beth Israel, supra*, 437 U.S. at 495, 98 S.Ct. at 2470. Randall failed to take the less restrictive approach of requesting that Cooke and the other employees talk more quietly. As the ALJ observed, "It may very well be that this particular 'lounge' area is not well suited for a lounge area because of its proximity to the operating room. Nevertheless, it has been so used by the employees for at least the past year." Here, there is substantial evidence to support the Board's conclusion that the Hospital failed to overcome the presumption that solicitation in non-immediate patient care areas of the hospital does not disturb patient care or disturb patients. Cooke was soliciting on nonwork time in a nonwork area. While Randall claimed that she was disturbed by Cooke's solicitation, her response to the alleged disturbance was overbroad under the circumstances. The Board's order predicated on its finding that Supervisor Randall's prohibition violated § 8(a)(1) shall be enforced.

### C. *Interrogation of Employee Siminski.*

1. Theresa Siminski, who no longer works at the Hospital, was the secretary to the assistant administrator in charge of fiscal affairs, Sol Goldner. She was questioned by both Goldner and Diller before and after the union meeting. Before the meeting, Diller asked Siminski if she knew anything about the union meeting and asked her to tell him the names of other employees who were planning to attend. Goldner called Siminski into his office twice on the day of the meeting. The first time he asked her not to go to the meeting.

Siminski became so upset that Goldner told her to take a break. After she returned from her break, Goldner again called her into his office and again asked her not to go. Later in the day, Goldner changed his mind; he suggested that she go to the meeting and then report back to him about what had happened there. After the union meeting, Diller called Goldner's office. Siminski answered the phone and Diller asked her whether she had gone to the union meeting and whether she had signed a union card. Siminski told him that she attended the meeting but that she did not sign a union card. Diller replied that he thought someone had told him that she had signed a card. After Diller conversed with Goldner on the telephone, Goldner called Siminski into his office. He asked her whether she had signed a union card and again she denied it.

None of these interrogations was found by the ALJ to have been an unfair labor practice because the ALJ concluded that Siminski, as secretary to Sol Goldner, was a "confidential employee" and thus did not come within the Board's definition of employees who are protected under the Act. The Board reversed this conclusion; it found that Siminski was not a confidential employee, and held that the conduct of Goldner and Diller violated § 8(a)(1).

2. It is established Board policy that employees who have a confidential relationship to "persons who formulate, determine, and effectuate management policies in the field of labor relations," are "confidential employees" and may be excluded from rank-and-file bargaining units. *The B. F. Goodrich Co.*, 115 NLRB 722, 724 (1956); *Ford Motor Co.*, 66 NLRB 1317 (1946). The ALJ found first, that Siminski worked in a confidential relationship with Goldner, and second, that Goldner is a person who formulates, determines, and effectuates management policies in the field of labor relations (the so-called "labor nexus" requirement, *see, e. g., Kleinberg, Kaplan, Wolff, Cohen & Burrows*, 253 NLRB No. 54 (1980)). Then the ALJ went on to find that the Board-created exclusion of confidential em-

ployees from rank-and-file bargaining units extends to exclude those employees from protection under the Act against unfair labor practices.[2] Therefore, according to the ALJ, the interrogations of Siminski by Diller and Goldner were not unfair labor practices because Siminski was a confidential employee, and as such, her concerted activities were not protected by the Act.

The Board reversed the ALJ's finding that Siminski was a confidential employee because the evidence was insufficient to indicate that Siminski worked in a confidential capacity to Goldner. Thus, the Board did not address the issue of whether Goldner, in his capacity as assistant administrator in charge of fiscal affairs, had the requisite labor nexus to warrant a finding that Siminski was a confidential employee. The Board did note that the ALJ made a finding inconsistent with current Board law when he concluded that the concerted activities of confidential employees go completely unprotected under the Act.[3] Likewise, we need not reach the labor nexus question or the question of the extent of coverage of confidential employees under the Act if we conclude that substantial evidence on the record as a whole supports the Board's finding that Siminski did not have the requisite confidential relationship with Goldner.

The Board stated that the ALJ's conclusion as to the confidential status of Siminski was based on a series of memoranda that were typed by Siminski for Goldner and that were introduced as evidence by the Hospital at the hearing. The documents included memoranda to the Hospital's personnel director regarding wage raises and evaluations by department heads of certain employees; a memo to an employee's file

regarding his termination; and other internal management memoranda regarding payroll and other matters. The Board emphasized that Siminski could not be said to have a confidential relationship to Goldner solely because she typed these memoranda and because she had access to confidential data. In addition, Siminski's other duties of answering Goldner's telephone, opening his mail, and working with raw, confidential data that Goldner eventually used to implement policy decisions upon fiscal matters were insufficient to conclude that Siminski was a confidential employee.

■ Prior Board decisions have established that mere access to confidential material or typing of confidential labor relations memoranda does not, without more, establish a confidential relationship. *United States Postal Service*, 232 NLRB 556 (1978); *Ernst & Ernst National Warehouse*, 228 NLRB 590, 591 (1977). This circuit has previously held that mere access to confidential data is insufficient to constitute confidential employee status. *See Union Oil Co. of Cal., Inc. v. NLRB*, 607 F.2d 852, 854 (9th Cir. 1979). The Board refrains from a broad definition of confidential employees—and justifiably so: "Because most employees have an arguably confidential relationship with management, and because an expansive application of the exclusionary rule would deprive many employees of the right to bargain collectively, the Board has narrowly construed the definition of confidential employee." *Union Oil, supra*, 607 F.2d at 853. We therefore conclude that substantial evidence on the record as a whole supports the Board's finding that Siminski was not a confidential employee and was thus entitled to protection under the Act.

2. In so doing, the ALJ relied on a Fourth Circuit case, *NLRB v. Wheeling Electric Co.*, 444 F.2d 783 (4th Cir. 1971), which holds that confidential employees were wholly excluded from protection under the Act because they were "supervisors" within the meaning of that term as used in § 2(3) of the Act; 29 U.S.C. § 152(3) provides in relevant part that, "The term 'employee' ... shall not include ... any individual employed as a supervisor."

3. *See Hendricks County Rural Electric Membership Corp.*, 236 NLRB No. 212 (1978), re-

versed, 603 F.2d 25 (7th Cir. 1979), *pet. for cert. docketed*, No. 80–885 (filed December 1, 1980); *Southern Greyhound Lines*, 169 NLRB 627 (1968), *enforced*, 426 F.2d 1299 (5th Cir. 1970). The Courts of Appeals are in disagreement as to whether confidential employees are protected under the Act for purposes of unfair labor practices. *Compare Hendricks County, supra* and *NLRB v. Wheeling Electric Co.*, 444 F.2d 783 (4th Cir. 1971) *with NLRB v. Southern Greyhound Lines, supra*.

■ Having found that Siminski was protected by the Act, we additionally find that substantial evidence supports the Board's finding that the interrogations of Siminski by Diller and Goldner were unlawful and in violation of § 8(a)(1). The questions put to Siminski could reasonably be construed to be threats of reprisal and reasonably created an impression that the employees were under surveillance. Siminski's testimony certainly indicated that she took the interrogations by Goldner to be veiled threats of reprisal for engaging in union activities.[4] The impression that the employees were under surveillance was imparted by Goldner's request of Siminski to attend the meeting and report back to him afterward. Such requests have been held to be unfair labor practices by the Board. See Ayer Lar Sanitarium, supra, 536 F.2d at 47–48.

Accordingly, we find that substantial evidence on the record as a whole supports the findings of the Board in their entirety.

ORDER ENFORCED.

---

4. Siminski testified that the second time she was called in to Goldner's office, she asked him, "If I go [to the union meeting], will you fire me?" During the hearing, the ALJ indicated that he gave a great deal of weight to Siminski's testimony: "As I've indicated earlier, Theresa Siminski was a very candid, I felt, and almost too nervous a witness to have been anything but credible and honest on this witness stand ..."