**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LORIMAR PRODUCTIONS, INC., Respondent.**

**LORIMAR PRODUCTIONS, INC., Cross-Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Cross-Respondent.**

Nos. 84-7531, 84-7561.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 6, 1985.

Decided Sept. 17, 1985.

Elliott Moore, Elinor Hadley Stillman, N.L.R.B., Washington, D.C., for petitioner.

Arthur Chinski, Debra P. Granfield, Buchalter, Nemer, Fields, Chrystie & Younger, Helena S. Wise, Geffner & Satzman, Los Angeles, Cal., for respondent.

Before PREGERSON, and ALARCON, Circuit Judges, and SOLOMON,* District Judge.

ALARCON, Circuit Judge:

The National Labor Relations Board (hereinafter the Board) applies for enforcement of its order requiring that Lorimar Productions, Inc. (hereinafter Lorimar) bargain with Production Office Coordinators and Accountants Guild Local 717, International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada (hereinafter the union). Lorimar cross-petitions for review, contending that its refusal to bargain was justified because (1) the Board certified an inappropriate bargaining unit; (2) the Regional Director conducted the representation election pursuant to an official notice that incorrectly defined the bargaining unit; (3) the Board abused its discretion by failing to afford Lorimar an evidentiary hearing on its objections to the conduct of the election; (4) the Board abused its discretion by extending the union's certification in its remedial order; (5) the union failed to make a clear and proper demand for bargaining; and (6) Lorimar had a good faith doubt regarding the union's majority status.

We deny Lorimar's cross-petition insofar as it asserts that the Board certified an inappropriate unit. Because the Board's election procedures effectively denied the employees an opportunity to vote for representation in the unit certified by the Board, however, the Board's application for en-

* Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

forcement of its bargaining order is denied. Consequently, we do not reach Lorimar's remaining contentions.

## I

### PERTINENT FACTS AND PROCEDURAL POSTURE

Lorimar is a California corporation whose business is the production of motion pictures and television programs. On November 25, 1980, the union filed a representation petition with the Board seeking certification as the bargaining representative of Lorimar's estimators and production coordinators. The Regional Office conducted a representation hearing on December 19, 1980 to determine a unit appropriate for collective bargaining.

Following the hearing, the Board certified a unit composed of the estimators and production coordinators and directed an election for February 26, 1981. Lorimar filed a request for review of the Board's decision, contending that a combined unit of estimators and production coordinators was inappropriate because the estimators were technical employees, and arguing that the estimators and production coordinators were confidential and managerial employees.

On February 25, 1981, the Board granted Lorimar's request for review with respect to the status of production coordinators as confidential employees, and denied review in all other respects. The Board notified the Regional Director of its decision by telephone on the afternoon of February 25. The parties received notification by telegram on the day of the election. Nevertheless, the election took place as originally scheduled. Both production coordinators and estimators voted; the estimators were under the impression that the unit on which they were voting included both the estimators and the production coordinators. Ballots were received from eleven estimators and six production coordinators, and the ballots were segregated and impounded pending the Board's review decision.

On September 1, 1981, the Board issued a decision on review finding that the production coordinators were confidential employees and excluding them from the unit. *Lorimar Productions, Inc.,* 257 N.L.R.B. 1138, 1139 (1981). The estimators' ballots were opened and counted on October 1, 1981, and the tally showed six votes for the union, four votes against, and one nondeterminative challenged ballot.

Lorimar filed timely objections alleging that the election results should be set aside because (1) the election was conducted on the assumption that the production managers would be a part of the unit; (2) the union made material pre-election misrepresentations; and (3) the curtain on the voting booth was torn and did not close properly, thus destroying the secrecy of the election. After investigating Lorimar's objections, the Board overruled them and certified the union as the estimators' exclusive collective bargaining representative on November 12, 1981. Lorimar filed with the Board a request for review of the Regional Director's decision. The Board denied Lorimar's request, finding that it raised no substantial issues warranting review.

On September 2, 1982, the union requested that Lorimar bargain with it. On November 11, 1982, Lorimar refused. On December 8, 1982, the union filed an unfair labor practice charge alleging that Lorimar had violated National Labor Relations Act (NLRA) §§ 8(a)(1) and (a)(5) by refusing to bargain with the union. The Board issued a complaint, and the union answered. The Board granted General Counsel's motion for summary judgment on April 26, 1984.

The Board's order requires Lorimar to cease and desist from refusing to bargain with the union and from interfering with its employees' NLRA § 7 rights in any similar manner. The order also requires Lorimar to bargain with the union on request and construes the initial period of union certification as beginning on the date Lorimar commences such bargaining with the union.

**1298**

## II

## THE BOARD'S UNIT DETERMINATION

Lorimar contends that because the Board's unit determination was inappropriate, Lorimar did not commit an unfair labor practice by refusing to bargain with the union. *See NLRB v. West Coast Liquidators, Inc.,* 725 F.2d 532, 534 (9th Cir. 1984) (employer does not commit unfair labor practice by refusing to bargain if the Board abused its discretion in certifying the union). Specifically, Lorimar asserts that the Board erred in certifying a unit composed of estimators because they are confidential employees not covered by the NLRA.

 We will enforce the Board's order if the Board's factual findings are supported by substantial evidence in the record and if the Board correctly applied the law. *NLRB v. Carpenters Local Union No. 35,* 739 F.2d 479, 481–82 (9th Cir.1984). The Board's legal conclusion that a unit is appropriate is reviewable only for an abuse of discretion; its unit determinations will be credited on appeal unless clearly arbitrary or capricious. *Alaska StateBank v. NLRB,* 653 F.2d 1285, 1287 (9th Cir.1981) (*quoting Pacific Southwest Airlines v. NLRB,* 587 F.2d 1032, 1037 (9th Cir.1978)). In the instant case, however, the Board's unit determination is based solely upon its finding that estimators are not confidential employees. This is a factual finding reviewable for substantial record support. *NLRB v. Hendricks County Rural Electric Membership Corp.,* 454 U.S. 170, 191, 102 S.Ct. 216, 229, 70 L.Ed.2d 323 (1981); *NLRB v. Los Angeles New Hospital,* 640 F.2d 1017, 1023 (9th Cir.1981).

 The NLRA requires that two categories of confidential employees be excluded from bargaining units: (1) those employees who "assist and act in a confidential capacity to persons who formulate, determine, and effectuate management policies

in the field of labor relations" (*B.F. Goodrich Co.,* 115 N.L.R.B. 722, 724 (1956)), and (2) "those employees who, in the course of their duties, regularly have access to confidential information concerning anticipated changes which may result from collective-bargaining negotiations." (*Pullman Standard Division, Inc.,* 214 N.L.R.B. 762, 762–63 (1974)). *Union Oil Co. v. NLRB,* 607 F.2d 852, 853–54 (9th Cir.1979). The rationale behind the exclusion of confidential employees from the bargaining unit is that employees should not be placed in a position which creates a potential conflict between the interests of the employer and the union. *Id.* at 853.

 Lorimar's estimators do not fall within either category of confidential employees. The central inquiry in ascertaining whether an employee falls within the first category is whether the employee is in a confidential work relationship with a specifically identifiable managerial employee responsible for labor policy. *Id.* The record shows that the estimators are supervised by vice president/controller Mary Van Houten, who has no authority to make decisions on labor policy matters.

Lorimar argues that because estimators "work with" unit production managers, the estimators have a confidential relationship with unit production managers.[1] The record demonstrates, however, that the estimators' relationship with the unit production managers is limited to obtaining information from them for inclusion in the budget, and on occasion providing information regarding existing or mathematically predictable labor costs. The estimators' occasional performance of such clerical duties for the unit production managers does not demonstrate the existence of a confidential work relationship where the estimators are not generally under their supervision. *See Union Oil Co., supra,* at 853 (computer operators under the supervision of computer operations manager do not become confidential employees by vir-

---

**1.** Lorimar's unit production managers are managers within the meaning of the NLRA who formulate, determine, and effectuate management policies in the labor relations area. *Lorimar Productions, Inc.,* 257 N.L.R.B. 1138, 1138 (1981).

tue of furnishing employee information to personnel supervisor who is responsible for labor relations).

■ Lorimar also contends that the estimators assist the unit production managers in making labor relations decisions, and concludes that performance of these duties places the estimators in a confidential work relationship. The record does establish that on at least one occasion an estimator did calculate Lorimar's potential liability prior to settlement of a meal payment grievance. An employee is not regarded as confidential, however, simply because he supplies information to someone involved in the handling of grievances. *Union Oil, Co., supra,* at 853 (computer operators' responsibility for providing employee information to manager upon request for purposes of resolving grievances and negotiating labor contracts does not render them confidential employees); *Weyerhaeuser Co.,* 173 N.L.R.B. 1170, 1172–73 (1968) (employee is not regarded as confidential merely by virtue of being a secretary to a person involved in the handling of grievances).

■ Lorimar's estimators also fall outside of the second category of confidential employees because they do not have access to confidential information that might be used in future contract negotiations. The evidence presented at the representation hearing established that the estimators' duties include the preparation of a budget showing estimated costs for each episode or production, the monitoring of those costs during production, and the preparation of a post-production report comparing projected and actual costs. The estimators survey the following categories of information in preparing their budgets: (1) budget information received from various department heads; (2) existing labor contracts; (3) "deal memos" (confidential employment agreements negotiated with individual employees with rates and terms of employment above the scale of the collective bargaining agreement) or "start cards" (confidential documents containing a summary of the terms of the deal memo and W–4 tax information); (4) the terms of labor griev-

ance settlements; and (5) employees' time cards.

Lorimar argues that the estimators' access to information regarding the precise earnings of each employee, records detailing the amount of any monetary settlement reached in a labor dispute, and capital budget information such as licensing fee revenue received from the networks, constitutes access to confidential information foreshadowing Lorimar's future bargaining position and potentially acceptable future labor rates. We disagree. In *Union Oil Co., supra,* we rejected the company's argument that its computer operators' access to data concerning its capital and expense budgets and individual personnel information gave them confidential status. *Id.* at 854. We held that where there was no showing that the capital budget indicated the *precise* labor rates which the company would accept, or that it otherwise disclosed the company's bargaining position, employees who have access to personnel or statistical information upon which the company's labor relations policy is based are not necessarily confidential employees. *Id; see also N.L.R.B. v. Jaggers-Chiles-Stovall, Inc.,* 639 F.2d 1344, 1347 (5th Cir.) (information regarding existing wage rates for bargaining unit employees is not confidential), *cert. denied,* 454 U.S. 826, 102 S.Ct. 116, 70 L.Ed.2d 100 (1981).

In the instant case, Lorimar has not established that either the capital budget or the individual employment agreements and grievance settlements to which the estimators have access establish the *precise* labor rates which Lorimar would accept in future labor agreements. Instead, Lorimar argues that the estimators' access to such information enables them to predict *potentially* acceptable future labor rates. If we were to accept Lorimar's argument, virtually every employee with access to information concerning company income, expenses, or past and present labor costs would be a confidential employee because the information *could* be used to predict the company's future bargaining position. As we made clear in *Union Oil, supra,* this is not the

result contemplated by the *Pullman Standard* test.

The Board's factual finding that Lorimar's estimators are not confidential employees is supported by substantial evidence in the record. Because the Board correctly applied the law to its findings in determining that the estimators should be included within the bargaining unit, we deny Lorimar's cross-petition for review of the Board's unit determination.

## III

## CONDUCT OF THE REPRESENTATION HEARING

Lorimar also argues that the Board erred in certifying a unit of estimators upon a ballot count obtained in an election in which voters were told that they were electing a representative for a unit which included both estimators and production coordinators. Because the scope of the unit is crucial to an employee's vote in a certification election, Lorimar asserts that the Board should have either stayed the election pending its decision on review of the composition of the unit, or informed the voters of the two possible bargaining units and have them cast two ballots.

■■■ The Board has broad discretion to establish the procedure and safeguards necessary in conducting representation elections to insure the fair and free choice of bargaining representatives contemplated by the NLRA. *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330, 67 S.Ct. 324, 327, 91 L.Ed. 322 (1946); *see also NLRB v. Sonoma Vineyards, Inc.*, 727 F.2d 860, 863 (9th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 130, 83 L.Ed.2d 71 (1984). (Board has broad discretion in conducting and supervising representation elections). Nevertheless, we have a responsibility to function as more than a mere "rubber stamp" for the Board's decisions. *NLRB v. Chatfield-Anderson Co., Inc.*, 606 F.2d 266, 268 (9th Cir.1979). An election will be set aside if the election process is "significantly impaired" by the defect. *Summa Corp. v.*

*NLRB,* 625 F.2d 293, 295 (9th Cir.1980) (*quoting NLRB v. Health Tec Division/San Francisco,* 566 F.2d 1367, 1372 (9th Cir.), *cert. denied,* 439 U.S. 832, 99 S.Ct. 110, 58 L.Ed.2d 127 (1978)).

■■■ The Board asserts that Lorimar's failure to raise its objection prior to the election by requesting a stay of the election pursuant to section 102.67(b) of the Board's Rules and Regulations resulted in a forfeiture of Lorimar's right to challenge the election procedure employed by the Board. We disagree. Section 102.67(b) provides, in relevant part, as follows:

> The filing of such a request [for review of the Regional Director's decision] shall not, unless otherwise ordered by the Board, operate as a stay of the election or any other action taken or directed by the regional director: *Provided, however,* That if a pending request for review has not been ruled upon or has been granted ballots whose validity might be affected by the final Board decision shall be segregated in an appropriate manner, and all ballots shall be impounded and remain unopened pending such decision.

29 C.F.R. § 102.67(b) (1984). Nothing in this section indicates that a party must seek a stay of election in order to preserve its right to object to an election.

Moreover, Lorimar had no basis for an objection until the Board issued its decision on review excluding the production coordinators from the unit. *See Hamilton Test Systems v. NLRB,* 743 F.2d 136, 140 (2d Cir.1984) (grounds for objection to election procedure arose only when Board, months after the election, decided to reshape the bargaining unit presented to the voters). Furthermore, Lorimar did not receive notification of the Board's decision to grant Lorimar's petition for review in part until the day of the election. Therefore, as a practical matter Lorimar had no time to request a stay of election. Lorimar filed timely post-election objections to the conduct of the election which raised this issue. Therefore, Lorimar's challenge to the election procedure is properly before us.

Lorimar contends that the Board's application of the ballot impound procedure specified in section 102.67(b) to the instant case is inconsistent with the purposes of the NLRA because it denied the employees their right to choose freely a collective bargaining representative. Lorimar relies upon a recent Second Circuit case, *Hamilton Test Systems, Inc. v. NLRB, supra,* which we find factually indistinguishable from the instant case. In *Hamilton,* the Board initially certified a unit of 31 employees. Both the union and the company sought review of the Board's decision. On the day before the election, the Board notified the Regional Director by telephone that it was granting the union's request for review. Nevertheless, the Board conducted an election based upon the 31-employee unit originally certified, and the ballots were impounded pursuant to Rule 102.-67(b). Following the Board's subsequent certification of a 14-employee unit, the ballots cast by those in the smaller unit were counted. The tally was six in favor of union representation and four against.

The Second Circuit scrutinized section 102.67(b) and concluded that the Board's application of the section effectively denied employees the right to make an informed choice in a representation election. *Id.* at 142. The court opined that although the rule properly serves its major purpose of eliminating meritless appeals filed to delay the conduct of an election which involve only the inclusion or exclusion of a few voters, its application to a meritorious challenge which could significantly alter the scope of the unit violates the NLRA because it misleads the employees on a critical fact. *Id.* at 140. The court summarized:

> We do not believe that the regulation provides the Board with the authority to inform employees that they are voting for representation in a broad facility-wide unit and later to consider the ballot as a vote for representation in a unit that is less than half the size and considerably different in character.

We agree with the Second Circuit's analysis. The ballot impound procedure set forth in Rule 102.67(b) was recommended by the Chairman's Task Force on the NLRB. *See* Chairman's Task Force on the NLRB, Interim Report and Recommendations 13 (1976) (unpublished report) (hereinafter Task Force Report). In the context of a disputed unit determination, however, the Task Force report recommended only that the Board

> develop a balloting process under which the election procedure could be held, whatever the eventual decision might be on the appropriate unit. An analogue is the *Globe [Globe Machine & Stamping Co.,* 3 N.L.R.B. 294 (1937) ] election procedure which has been used successfully since 1937....

Task Force Report at .12. As the *Hamilton* court suggested, such a balloting process would be to inform the voters of the two possible bargaining units and have them cast two ballots, one for each unit. *Hamilton, supra,* at 141. All ballots could then be impounded pending the Board's ultimate unit determination. *Id.*

The reference in the Task Force Report to the analogous *Globe* election procedure persuades us that the Task Force envisioned the procedure suggested by the *Hamilton* court. The *Globe* self-determination procedure permits employees to determine the scope of a unit by allowing them to cast a vote for each of several potential units which the Board has determined are appropriate. We have approved the *Globe* procedure as consistent with the purposes of the NLRA. *Pacific Southwest Airlines v. NLRB, supra,* at 1038–39 n. 10.

Adoption of a similar procedure in the context of a pending challenge to the scope of a unit would avoid delay in the election process while at the same time preserving the employees' right to cast informed votes. As Congress recognized, delays in the election process should be avoided because they tend to undermine a union's election campaign by halting its momentum. *Boire v. Greyhound Corp.,* 376 U.S. 473, 478, 84 S.Ct. 894, 897, 11 L.Ed.2d 849

(1964) (quoting from H.R.Rep. No. 972, 74th Cong., 1st Sess. 5). The Task Force Report emphasized the need to avoid delays in the precise situation before us—where the Board has granted a request for review of a regional director's pre-election ruling. Task Force Report 7–8 ("if there are pending issues which could affect the validity of the election, they should be resolved *after* the election has been held") (emphasis in original).

■ Nevertheless, it is at least of equal importance that employees be afforded the opportunity to cast informed votes on the unit certified. The procedure followed by the Board in the instant case significantly impaired the conduct of the election by misleading the voters as to the scope of the unit, an issue which is central to the voters' ability to cast an intelligent, voluntary ballot. The ultimate unit certified by the Board (eleven estimators) differed substantially in size and nature from the unit voted upon (seventeen employees, including estimators and production coordinators). The vote was so close that the union would have lost had one employee voted differently. As the Second Circuit pointed out, the estimators might have voted differently had they known the composition of the ultimate unit because (1) they might have believed that the smaller bargaining unit would provide insufficient support to justify union representation; (2) the Board's unit determination split the work force, and the estimators could have believed that partial representation would have a divisive effect; or (3) an individual estimator's interpersonal relationships within the company might have changed his vote on a smaller unit. *See Hamilton, supra,* at 141.

The Board argues that delay in the election process would be an inevitable consequence of conducting a *Globe*-type election. The Board asserts that, as a practical matter, it would be impossible to prepare additional ballots in the time between notification that the regional director has granted a request for review and the election itself. In the present case, however, it is difficult to see how preparation of an additional eleven ballots could constitute an insurmountable barrier which would justify allowing employees to cast uninformed votes. Further, we are persuaded that the additional time required to explain the *Globe* procedure and its purpose to the voting employees would be well spent. Under the unique facts presented in this record, whatever practical burdens performance of these obligations impose upon the Board are, in our view, outweighed by the need to insure an informed and therefore meaningful vote.

■ Therefore, we hold that the Board's failure to collect two ballots from each voter, one on each potential unit, effectively deprived the employees of their right to cast a vote for representation in the unit ultimately certified by the Board. Lorimar's cross-petition for review on this ground is granted, and the Board's application for enforcement of its bargaining order is denied.[2] The case is remanded to the Board for the conduct of a new representation election.[3]

---

**2.** Lorimar also argues that because the Board's application of Rule 102.67(b) deprives the employees of crucial procedural protections guaranteed by the NLRA, the NLRA-imposed exclusive representation rule (i.e., that a union is the exclusive bargaining agent for all employees within a unit once the majority of the employees in the unit agree to representation) violates the employees' First Amendment freedom of association rights and Fifth Amendment due process rights. Because we conclude that the election procedures followed by the Board violated the NLRA, we need not reach the constitutional issues raised by this case. *See Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99, 101 S.Ct. 2193, 2199, 68 L.Ed.2d 693 (1981) (prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision).

**3.** Remand for a new election is appropriate despite the passage of time and accompanying employee turnover. New employees are presumed to support the union in the same ratio as their predecessors, and elections are the preferred method for ascertaining employee sentiment. *NLRB v. Western Drug,* 600 F.2d 1324, 1326 (9th Cir.1979).

PETITION FOR ENFORCEMENT DE-NIED; CROSS–PETITION FOR REVIEW GRANTED IN PART.

PREGERSON, Judge, dissenting.

I dissent from Part III of the majority opinion, which invalidates the representation election because the Board, having granted a request for review of the unit determination before the election, failed to require two ballots from each voter.

As the majority correctly notes, courts have held consistently that the Board has broad discretion to establish procedures and safeguards necessary to conduct representation elections. *NLRB v. Wyman-Gordon, Co.*, 394 U.S. 759, 767, 89 S.Ct. 1426, 1430, 22 L.Ed.2d 709 (1969); *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330, 67 S.Ct. 324, 327, 91 L.Ed. 322 (1946); *NLRB v. Berryfast, Inc.*, 741 F.2d 1161, 1163 (9th Cir.1984); *Summa Corp. v. NLRB*, 625 F.2d 293, 295 (9th Cir.1980). Our review of Board supervision of election proceedings is limited, *NLRB v. Metro-Truck Body, Inc.*, 613 F.2d 746, 748 (9th Cir.1979), and we may set aside an election only if the election process is "significantly impaired." *Summa Corp.*, 625 F.2d at 295 (quoting *NLRB v. Heath Tec Division/San Francisco*, 566 F.2d 1367, 1372 (9th Cir.), *cert. denied*, 439 U.S. 832, 99 S.Ct. 110, 58 L.Ed.2d 127 (1978)). Because I cannot conclude that the Board abused its discretion in applying its impound procedures under Rule 102.67(b) and in allowing the election to go forward, I would not set the election aside.

The Board's function in establishing election procedures is to weigh opposing interests and establish procedures necessary to insure the employees' fair and free choice of bargaining representatives. *See Wyman-Gordon*, 394 U.S. at 767, 89 S.Ct. at 1430. One of the most significant problems the Board faces in conducting elections is the avoidance of unnecessary delays in the election process. *Raley's Inc. v. NLRB*, 725 F.2d 1204, 1207 (9th Cir.1984) (en banc) (Pregerson, J., concurring); *see also* Weiler, *Promises to Keep: Securing Workers' Rights to Self-Organization Under the NLRA*, 96 Harv.L.Rev. 1795, 1769–1803 (1983). Congress recognized the difficulty with such delays as early as 1935 with the original passage of the Act:

> When an employee organization has built up its membership to a point where it is entitled to be recognized as the representative of the employees for collective bargaining, and the employer refuses to accord such recognition, the union, unless an election can be promptly held to determine the choice of representative, runs the risk of impairment of strength by attrition and delay....

*See Boire v. Greyhound Corp.*, 376 U.S. 473, 478, 84 S.Ct. 894, 897, 11 L.Ed.2d 849 (1964) (quoting H.R.Rep. No. 972, 74th Cong., 1st Sess. 5). In fact, the primary emphasis of the Chairman's Task Force Report, on which the majority relies, was to avoid delay in elections in precisely such cases as this: where the Board has granted a request for review of a regional director's pre-election ruling, but is unable to decide the case before the election.

In rejecting the Board's past practice of postponing the election until the Board has rendered a decision, the Task Force noted:

> Once an election has been directed, the parties gear their campaigns in light of the election date. To postpone the election in such circumstances is frustrating to a very high degree. If the election is ordered months later, the parties must then crank up their campaigns once again. Union members of the Task Force assert that there may have been an irretrievable loss of employee support. Further explication is unnecessary, for it seems self-evident that undue prolongation of the election is inconsistent with the basic purpose of Section 9 to provide a prompt method of resolving representation disputes.

> [O]nce an election date has been set, the election should be held on that date. If there are pending issues which could affect the validity of the election, they should be resolved *after* the election has been held. The ballots cast in the elec-

tion can be impounded and later counted, after the issues have been resolved, in whatever appropriate manner is indicated by the decision on the issues. The great virtue of this procedure is that it enables a registration of the employees' choice at the time when interest and momentum in both the union and employer camps are at their peak. While knowledge of the outcome may be postponed, the parties know that they will not again have to mount another electioneering campaign.

Chairman's Task Force on the NLRB, Interim Report and Recommendations 7–8 (1976) (unpublished report) (emphasis in original).

The Board enacted Rule 102.67(b) in 1977 in response to the recommendation of the Task Force. *See* 29 C.F.R. § 102.67(b) (1983). The Rule provides that the filing of a request for review of a regional director's decision will not act as a stay of an election and that if the Board has not acted on the request before the election, the ballots will be segregated and impounded pending decision. The majority concludes, relying on *Hamilton Test Systems v. NLRB*, 743 F.2d 136 (2d Cir.1984),[1] that the operation of this Rule deprives the employees of their section 7 rights and that instead the Board should have implemented a multiple-balloting procedure similar to that in a *Globe* election. While recognizing the problems of delay, the majority concludes that it was of more importance that the employees be allowed to vote on both potential units, and that even if the election could not proceed as scheduled, "[t]he additional time required to explain the *Globe* procedure and its purpose to the voting employees would be well spent."

The majority's approach would cause precisely the delay that the Task Force sought to eliminate. The election's momentum would be broken and the parties would have to mount another campaign. In addition, in contrast to the *Globe* procedure there is no express provision in the Act mandating an additional election in a case such as this. *Cf.* NLRA § 9(b)(1) & (2), 29 U.S.C. § 159(b)(1) & (2). And "[w]e are not authorized to bind the Board in ways not mandated by Congress." *NLRB v. Action Automotive, Inc.,* —— U.S. ——, 105 S.Ct. 984, 989, 83 L.Ed.2d 986 (1985) (upholding Board rule excluding from bargaining unit employees who are relatives of management). Moreover, the Task Force serves merely in an advisory capacity, Task Force Report at 1, and it did not require the Board to implement a *Globe*-type multiple-ballot election. Task Force Report at 8.

It may be that the Board's rule providing for segregation and impounding of ballots is not ideal for every case: "However, we do not make labor policy under § 9(b); Congress vested that authority in the Board." *Action Automotive,* 105 S.Ct. at 988. In making the decision to require multiple ballots, the majority usurps the Board's function to make that determination. The Board properly exercised its discretion by balancing the interest in avoiding delay against the speculative possibility of vote changes and by deciding that avoiding delay was the more weighty concern. Moreover, it is important to note that if the Board's rule operates to deprive employees of their free choice, they are not without remedy. If the majority of the employees no longer wish to be represented by the union certified by the Board, they may file a decertification petition. *See* NLRA § 9(c)(1)(A)(ii), 29 U.S.C. § 159(c)(1)(A)(ii).

In the final analysis, "the issue here resolves into the proper allocation of institutional responsibility between an administrative agency and a reviewing court...." [T]he agency must make judgments based on available knowledge. This is a difficult task and accounts in part for the decision of Congress to entrust the Board 'with a wide degree of discretion....'" *NLRB v. Savair Manufacturing Co.,* 414 U.S. 270, 289–90, 94 S.Ct. 495, 504, 38 L.Ed.2d 495 (White, J., dissenting) (quoting *A.J. Tower,* 329 U.S. at 330). Rule 102.67(b) is a reasonable approach to dealing with the seri-

---

**1.** While reluctant to create a split between circuits unnecessarily, I am unable to approve the Second Circuit's interference with the Board's autonomy in conducting elections.

ous problem of delay in conducting representation elections. We should yield to the Board's reasonable interpretation and applications of the Act. *Action Automotive,* 105 S.Ct. at 988; *NLRB v. City Disposal Systems, Inc.,* 465 U.S. 822, 104 S.Ct. 1505, 1510, 79 L.Ed.2d 839 (1984).

