**NIGHTINGALE OIL COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 89–1886.

United States Court of Appeals, First Circuit.

Heard March 8, 1990.

Decided June 6, 1990.

**COFFIN, Senior Circuit Judge.**

Nightingale Oil Company ("Nightingale" or "the company") has petitioned for review of an order of the National Labor Relations Board requiring it to cease and desist violating Sections 8(a)(1) and (5) of the National Labor Relations Act (29 U.S.C. §§ 158(a)(1) and (5)) by refusing to bargain with Teamsters Local Union 25 ("the union"). The Board has cross-applied for enforcement of the order. The company challenges the balloting conducted under the Board's vote-and-impound procedure and the appropriateness of the unit certified. We deny the petition for review and grant the Board's application for enforcement.

## I. FACTS

Nightingale Oil, located in Braintree, Massachusetts, installs and services oil burner equipment and sells heating oil. Nightingale employs seven oil burner servicemen, two oil delivery drivers, four clerical workers and a dispatcher. The union petitioned in April 1987 for an election to certify it as the exclusive bargaining representative of a unit composed of the oil burner servicemen.

After a hearing, the Regional Director found that the oil burner servicemen comprised an appropriate unit and scheduled an election to be held on July 1 from 4:30 to 5:30 p.m. On June 17, 1987, the company filed a request for review with the Board, arguing that all three classifications—servicemen, drivers and clericals—should have been included in the bargaining unit. In the alternative, Nightingale argued that the appropriate unit was composed of servicemen and drivers.

The next day, the Board confirmed that the election would be held as scheduled. The notice of election was posted at Nightingale for at least three days before the election and stated that "[t]hose eligible to vote are all full-time and regular part-time oil burner servicemen employed by the Employer at ... Braintree, ... excluding all other employees." Appendix at 279.

Christopher J. Perry with whom Neil Jacobs, Lynne McCarthy, and Hale & Dorr, Boston, Mass., were on brief, for petitioner.

Julie B. Broido, Atty., with whom William R. Stewart, Deputy Asst. Gen. Counsel, Jerry M. Hunter, Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, and Aileen A. Armstrong, Deputy Associate Gen. Counsel, for respondent.

Before CAMPBELL, Circuit Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

On the morning of July 1, the Board granted the company's request for review of the unit determination. Joseph Kane, at the regional office, telephoned the company's attorney, Christopher Perry. According to Perry, Kane told him that the election was to proceed as scheduled, and Kane instructed management to inform the clericals and drivers that they were eligible to vote, but to keep comments brief, to the extent possible. Perry was given the phone number of an individual in the office of the Board's Executive Secretary. Perry indicates that in his conversation with that individual, whose name Perry cannot recall, there was no discussion of what explanation should be given to voters. He claims, however, that the individual admitted that the situation could be confusing yet insisted that the election nevertheless proceed in the manner directed. Perry never discussed in either conversation the possibility of alternative balloting procedures, whereby separate ballots would be taken for each of the three possible units that the Board might certify.[1]

Nightingale, through its attorney, sent a hand-delivered letter to the Board before the election took place, objecting to an election being conducted that day that would allow employees other than servicemen to vote.[2] As in the telephone conversations, the letter did not suggest alternative balloting procedures.

The company duly informed the clericals and drivers that they were eligible to vote. George Nightingale testified that he did not speak to any serviceman before the election. He stated, however, that following the election, serviceman Ronald Walker told him that he had not voted because, since everyone was now voting, his vote would be insignificant.

The three employee classifications all voted in due course. Each voter was given only one ballot. In accordance with Board procedures, the agent challenged and segregated the ballots of the drivers and clericals, and all votes were impounded pending the outcome of the Board's review of the unit determination. The Board's election representative did not explain to employees why clericals and drivers were being allowed to vote. The agent also made no representations concerning the scope of the unit.

In October, 1987, the Board issued an order affirming the Regional Director's unit determination. The impounded ballots of the servicemen were opened and counted. Of the seven eligible voters in the unit, six had voted, five in favor of the union and one opposed. The employer filed objections to the manner of the election, contending that the election must be set aside because the last-minute decision to allow clericals and drivers to vote effectively changed the scope of the bargaining unit and misled the servicemen concerning the unit for which they were voting.

The Regional Director issued a report on objections finding that a new election was not warranted because the vote-and-impound procedure employed in the election was consistent with Section 102.67(b) of the Board's Rules and Regulations and did not prejudice the election.[3] The employer filed

---

1. Those possible units were servicemen only, servicemen and drivers, and servicemen, drivers and clericals.

2. The letter stated:

    We spoke this morning by telephone and you informed me that the Request for Review filed on behalf of Nightingale Oil Company in the above-captioned matter had been granted. You also informed me that the NLRB had not stayed the election scheduled for today, and that an election would be held among all drivers, oil burner servicemen and clerical employees at Nightingale. At that time, I informed you it was the position of Nightingale that it would be inappropriate at this time to hold an election for employees other than those included in the bargaining unit found appropriate by the Regional Director in his Decision and Direction of Election. Please be advised that if the election is held today and includes employees other than those in the unit found appropriate by the Regional Director, Nightingale reserves the right to challenge the validity of that election in any and all respects.
    Appendix at 282.

3. The regulation provides in relevant part:
    The filing of ... a request [for review of a regional director's decision] shall not, unless otherwise ordered by the Board, operate as a

exceptions to the Regional Director's report. In July 1988, the Board adopted the Regional Director's findings and recommendations. The Board thereupon certified Teamsters Local Union 25 as the exclusive collective-bargaining representative of the unit of oil burner servicemen at Nightingale.

The union made numerous efforts to engage in collective bargaining with Nightingale; the company refused to meet. The union filed an unfair labor practice charge with the Board in December 1988. Nightingale defended the charge by challenging both the election procedures and the appropriateness of the unit certified. The Board found, on a motion for summary judgment, that Nightingale had violated the Act by refusing to bargain. The Board reiterated that it found Nightingale's objection to the manner of the election to be without merit. It ordered the company to bargain on request with the union.

Nightingale seeks review of this order, challenging both the manner of the election and the appropriateness of the unit of oil burner servicemen. We discuss each issue in turn.

## II. MANNER OF ELECTION

■ Congress has conferred broad discretion on the Board to establish procedures and conduct representation elections. *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 333, 67 S.Ct. 324, 329, 91 L.Ed. 322 (1946). In formulating procedures for the conduct of an election, the Board is entitled to make "justifiable and reasonable adjustment[s] to the democratic process," *id.*, to accommodate interests such as finality and minimizing delay. The Board's determination that the election was fairly conducted can be set aside only for an abuse of discretion. *NLRB v. Mattison Machine Works*, 365 U.S. 123, 124, 81 S.Ct. 434, 435, 5 L.Ed.2d 455 (1961); *New England Lumber Divi-*

*sion of Diamond v. NLRB*, 646 F.2d 1, 3 (1st Cir.1981).

■ As the Supreme Court repeatedly has emphasized, "[t]he formulation of procedures was basically ... left within the discretion of the agencies to which Congress ... confided the responsibility for substantive judgments." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978).

> Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them. This is not to say necessarily that there are no circumstances which would ever justify a court in overturning agency action because of a failure to employ procedures beyond those required by statute. But such circumstances, if they exist, are extremely rare.

*Id.* "[T]he test is not whether optimum practices were followed, but whether on all the facts the manner in which the election was held raises a reasonable doubt as to its validity." *NLRB v. ARA Services, Inc.*, 717 F.2d 57, 68 (3d Cir.1983). The party opposing election results bears a heavy burden of demonstrating not only an impropriety, but also that it "was sufficiently prejudicial or sufficiently material to warrant setting the election aside." *New England Lumber*, 646 F.2d at 3. *See also Fall River Savings Bank v. NLRB*, 649 F.2d 50, 56 (1st Cir.1981). An election will be set aside only where the defect "significantly impair[ed] the election process." 646 F.2d at 3. *See also NLRB v. Lorimar Productions, Inc.*, 771 F.2d 1294, 1300 (9th Cir. 1985).

■ Nightingale argues that the Board abused its discretion in finding that the election process was not significantly impaired when the clerical workers and driv-

stay of the election or any action taken or directed by the regional director: *Provided, however,* That if a pending request for review has not been ruled upon or has been granted ballots whose validity might be affected by

the final Board decision shall be segregated in an appropriate manner, and all ballots shall be impounded and remain unopened pending such decision.

29 C.F.R. § 102.67(b) (1989).

ers were allowed to vote and only one ballot was taken. The company claims that the procedure effectively changed the scope of the unit from that described in the notice of election. It argues that employees have an interest in the size of the collective bargaining unit seeking to represent them; it implies that the results of the election would likely have been different if the servicemen had known that only they were included in the unit. The Board, the company asserts, was required to avoid confusion by collecting ballots on each of three possible bargaining units: servicemen only; servicemen and drivers; and servicemen, drivers and clericals.

In making this argument, the company relies on three cases in which courts of appeals have held that use of the Board's vote-and-impound procedure was improper. *See NLRB v. Parsons School of Design,* 793 F.2d 503 (2d Cir.1986); *NLRB v. Lorimar Productions, Inc.,* 771 F.2d 1294 (1985); *Hamilton Test Systems, N.Y., Inc. v. NLRB,* 743 F.2d 136 (2d Cir.1984). In *Hamilton,* the court found error when, pending review, the Board conducted a vote in a facility-wide unit and later counted the vote for, and certified, a smaller included unit. The Regional Director had designated the larger unit and the notice of election described that unit. The union challenged the unit determination, arguing that the smaller unit was appropriate. The Board granted review. After the election, the Board rejected the Regional Director's unit determination, and found the smaller unit to be appropriate. The ballots of the segregated smaller unit were opened and counted. The vote was six votes for the union and four votes against it, and the union was certified as the collective bargaining representative. The Second Circuit held that where employees were given notice that the election would be for a representative in a unit more than twice as large as that ultimately certified, the altered unit determination required a new election. The court, noting that the change in a single vote would have altered the result, rejected the Board's contention that the outcome would not have been different. The court listed four reasons why employ-

ees might have agreed to be represented by a larger unit and not a smaller one.

First, the employees might have believed that the smaller bargaining unit would provide insufficient strength to justify union representation. Second, the unit consisted of the lower tier of employees in terms of pay and opportunities for advancement. The technicians might not have wished to have union representation in a unit ... segregated from the better paid and perhaps more attractive positions.... Third, under the broader bargaining unit, a vote for the union would have maintained a unified work force.... Fourth, interpersonal relationships within the plant might have made an individual employee comfortable with a facility-wide unit but caused concern and distress over leadership in a smaller unit."

*Hamilton,* 743 F.2d at 141.

The Ninth Circuit, addressing the same issue in *Lorimar,* 771 F.2d 1294, concluded that its facts were indistinguishable from those of *Hamilton* and adopted the reasoning of the *Hamilton* court. In *Lorimar,* employees were given formal notice of an election in a unit including both estimators and production coordinators. On the eve of the scheduled election, the Board granted review of the certified unit. The election took place as scheduled, and votes were segregated and impounded. After the election, the Board determined that the appropriate unit included only the estimators. It counted the votes of this group of employees and certified the union as the collective bargaining representative by a vote of six to four. The *Lorimar* court suggested that where the unit size had been changed significantly and where the vote was close, the use of the vote-and-impound procedure without collecting separate ballots for the different possible bargaining units deprived employees of their right to make an informed choice. 771 F.2d at 1302.

One year later, the Second Circuit revisited the question. In *Parsons,* a unit described before the election as encompassing both full and part-time faculty was changed after the election to include only

part-time faculty. Once again, the election was close (99 for the union, 92 opposed). The ultimate unit size, however, differed from the unit designated on the notice of election by only 10 percent. The court held that the case was controlled by *Hamilton*. A change in only four of the 99 votes for the union (just over 2 percent of the total vote) would have changed the outcome. Despite the small change in the size of the unit, the court found that "the character and scope of the unit were significantly altered by the Board's post-election modification." *Parsons*, 793 F.2d at 507. On these facts, the court held that the election procedures effectively "denied the employees their right to make an informed choice of a collective bargaining representative." *Id.*

The company argues that these decisions require us to find that the Board erred in upholding the validity of the election. We disagree. The factual distinctions between those cases and the instant one, viewed in light of the deference we owe to the Board's selection of procedures, persuades us that the Board's process here was not so deficient that we can say the Board abused its discretion in validating the election.

In the first place, unlike in *Hamilton, Lorimar* and *Parsons*, the notice of election at Nightingale informed the servicemen that the unit for which they were voting consisted of oil burner servicemen only, the same unit ultimately found appropriate by the Board on review. Nightingale argues that distinguishing the cases based on the content of the notice of election elevates form over substance. It claims that allowing clericals and drivers to vote effectively announced a change in the scope of the unit and that, therefore, the notice of election was rendered irrelevant.

We agree that allowing other employees to vote precludes full reliance on the notice of election; what actually happened was inconsistent with that notice, and at least one serviceman was aware that other employees were allowed to vote. Nevertheless, we think it highly relevant that the notice was never altered and that it accurately described the unit as composed of only oil burner servicemen, which was the unit eventually certified. No contrary statement ever was made to the servicemen by the Board or the company. George Nightingale reported that he had informed the clericals and drivers that they could vote, but that he had no conversation with the servicemen on the subject.

It is quite likely, therefore, that at least some of the servicemen did not know that the unit described in the notice had been challenged and that all employees were being allowed to vote. It is likely that they voted based on the assumption, which proved accurate, that the unit's scope was as described in the notice.

In addition, that the servicemen either did not know about a possible change, or did not care about the scope of the unit, is indicated by the absence of expressed concerns. No evidence suggests that questions were asked by servicemen of either management or the Board's agent. After the election, the one serviceman who did not vote indicated that he had not considered it worthwhile to do so because his vote would carry little weight if all three classifications voted. But there is no evidence suggesting which way he would have voted or that the scope of the unit made a difference in his view toward union representation.

It seems reasonable to assume that if servicemen were confused about the unit size, and if that confusion mattered to their votes, some serviceman would have made an inquiry. Unlike in *Hamilton, Lorimar* and *Parsons*, where the units announced before the election were larger than the units ultimately certified, giving employees no reason to question who was voting, the servicemen here had a basis for inquiry at the time of the election. Without, at the least, some evidence of concern by the servicemen, we are not inclined to believe that concern or confusion over the scope of the unit affected the vote.

Moreover, unlike in each of those cited cases, this election did not result in a narrow victory for the union. The union received five of the six votes cast, and only one member of the unit who was eligible to

vote did not do so. In arguing that the election results would have been different if the servicemen knew that they were voting for a unit in which they would be the only members, the company assumes two things: (1) that most servicemen knew that everyone had been allowed to vote and believed that this changed the composition of the unit for which they were voting; and (2) that most servicemen had a different preference about representation depending upon the scope of the unit. Without concerns voiced by *anyone*, however, there is simply no basis in the record for us to overturn the Board's implicit judgment that the voting change had, at best, an insubstantial effect on the outcome of the election.

We also think it important to recognize Congress' concern that elections not be delayed by dilatory procedural tactics. *See, e.g., Boire v. Greyhound Corp.*, 376 U.S. 473, 478, 84 S.Ct. 894, 897, 11 L.Ed.2d 849 (1964) ("'the union, unless an election can promptly be held to determine the choice of representation, runs the risk of impairment of strength by attrition and delay'") (quoting H.R.Rep. No. 972, 74th Cong., 1st Sess., 5). The Board developed its vote-and-impound procedure in response to a report noting that the past practice of delaying elections upon a request for review operated to dissipate previously generated union support. *See* Chairman's Task Force on the National Labor Relations Board, *Interim Report and Recommendations, reprinted in CCH Special Report* 11 (Nov. 29, 1976) [hereinafter "Task Force Report"]. The Task Force Report found that the past practice was "inconsistent with the basic purpose of [the Act] to provide a prompt method of resolving representation disputes." *Id.* at 12. It went on to recommend that the Board implement "a balloting process under which the election could be held, whatever the eventual decision might be on the appropriate unit." *Id.*[4]

The Board contends that the company's suggested last-minute change in the voting

process could have engendered greater confusion than proceeding with its segregated vote-and-impound procedure. Delay would have been inevitable if the Board had decided to collect separate ballots for different possible bargaining units because of the need for additional printing and for explaining to the employees in detail the various possibilities. We do not think that it was unreasonable for the Board to conclude that using its procedure was an appropriate compromise between democratic process and a speedy election, particularly here, where the original unit determination was upheld.

We therefore find that on the facts of this case, "the manner in which the election was held [does not] raise[ ] a reasonable doubt as to its validity." *ARA Services, Inc.*, 717 F.2d at 68. We hold that the Board did not abuse its discretion in applying the vote-and-impound procedure and in certifying the union as the exclusive bargaining representative of the oil burner servicemen.

■ We also observe that the company never suggested alternative balloting procedures before the election, when it might have made a difference. On this basis, the Board claims that the company should be equitably foreclosed from raising the issue now. We are inclined to agree, although we do not rest on the point.

The company correctly notes that *Parsons, Lorimar,* and *Hamilton* declined to impose this requirement. *See Parsons*, 793 F.2d at 507; *Lorimar*, 771 F.2d at 1300; *Hamilton*, 743 F.2d at 140. But the same facts that make those cases different with respect to the effect of election procedures make them distinguishable on this point as well. In each of those cases, the company had no basis for objecting to a change in the unit size because the Board made no change in the unit until well after the election took place. Here, on the other hand, the company is arguing that the Board

---

**4.** The Task Force Report suggested that one method might be the procedure used in *Globe Machine and Stamping Co.*, 3 N.L.R.B. 294 (1937), in which employees were allowed to cast a vote for each of several potential units. The Board adopted its vote-and-impound procedure instead.

effected a change in the scope of the unit *before* the election. Yet the company maintains that it had no basis for suggesting alternative procedures until *after* the election. Presumably, both arguments cannot simultaneously be true. If allowing the clericals and drivers to vote operated to change the scope of the unit, it did so prior to the election. The company therefore had a reason to suggest before the election the alternative balloting procedure it now argues was required. *Parsons, Lorimar* and *Hamilton* all were decided before the election in this case, and the company should have brought the procedure recommended in those opinions to the Board's attention if it wished to base its claim of error on the Board's failure to use it.

We do not imply that the Board's procedure here was ideal.[5] Nevertheless, it is not this court's role to require the best procedures of any agency. *See Vermont Yankee,* 435 U.S. at 524–525, 98 S.Ct. at 1202–1203. Because a complaining party must meet a difficult standard when challenging an election, we counsel parties to seek to adjust procedures prior to the election, whenever possible.

### III. APPROPRIATE UNIT

■ Nightingale also challenges the unit determination made by the Regional Director and ultimately affirmed by the Board. The company argues that the Board gave inadequate consideration to a unit composed of servicemen, drivers and clericals. Alternatively, it contends that a unit composed of drivers and servicemen was appropriate.

"[T]he selection of an appropriate bargaining unit lies largely within the discretion of the Board, whose decision, 'if not final, is rarely to be disturbed'...." *South Prairie Constr. Co. v. Local 627, International Union of Operating Engineers,* 425 U.S. 800, 805, 96 S.Ct. 1842, 1844, 48 L.Ed.2d 382 (1976) (per curiam)

(quoting *Packard Motor Co. v. NLRB,* 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947)). The Board need not certify the *most* appropriate unit, but need only choose *an* appropriate unit. *Friendly Ice Cream Corp. v. NLRB,* 705 F.2d 570, 574 (1st Cir.1983). Our review, therefore, is limited to assuring that Board decisions "are not unreasonable, made arbitrarily or capriciously, or unsupported by substantial evidence." *Id.* at 575.

■ In determining an appropriate bargaining unit, the Board looks to whether the employees share a "community of interests." *South Prairie,* 425 U.S. at 805, 96 S.Ct. at 1844; *Friendly Ice Cream,* 705 F.2d at 575. The Board examines, among other things, the level of employee interchange, the extent of union organizing, the history of collective bargaining, the desires of the affected employees, the employer's organizational framework, and the similarity in skills, employee benefits, wages and hours of work. 705 F.2d at 575. This court has the responsibility to "assure that the Board fairly and reasonably considered all relevant factors, [but] 'the weight assigned by the agency to each factor it has fairly considered is a matter for it to determine.'" *Id.* at 575 (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)).

■ Nightingale makes a preliminary objection to the Board's unit determination. It argues that the Board erred by affirming the Regional Director's decision in a "conclusory fashion." The company asserts that, in affirming a decision of the Regional Director, the Board is required to elaborate on the reasoning of the Regional Director; the company suggests that the Board's decision is conclusory if it does not do so.

In support of this proposition, Nightingale cites a number of cases. *See, e.g., NLRB v. Yeshiva University,* 444 U.S. 672, 691, 100 S.Ct. 856, 867, 63 L.Ed.2d 115

---

5. Indeed, it is difficult for us to see the utility of a procedure that will result in a dispute over the manner of the election regardless of the success (as in *Hamilton, Lorimar* and *Parsons*) or failure (as in this case) of the challenge to the Regional Director's unit determination. The Board's interest in minimizing delay may be more than offset by the lengthy process leading to a court review of an unfair labor practice charge.

(1980) (unit determinations must be based on an "examination of the facts of each case" and not "on the basis of conclusory rationales"); *NLRB v. Metropolitan Ins. Co.*, 380 U.S. 438, 442, 85 S.Ct. 1061, 1063, 13 L.Ed.2d 951 (1965) (Board abuses its discretion where decisions are inconsistent and Board provides no rationale that suggests that factor inappropriate under the statute was not conclusively considered); *NLRB v. Great Western Produce, Inc.*, 839 F.2d 555, 557 (9th Cir.1988) (Board has duty to explain departures from established agency policy or precedent). None of these cases supports Nightingale's conclusion about the Board's decision here.

First, the Regional Director's decision is consistent with Board precedent, so there was no need to explain a departure. *Cf. Great Western Produce*, 839 F.2d at 557. The Regional Director expressly relied on *Dahl Oil Co.*, 221 N.L.R.B. 1311 (1975), where the Board found a unit of oil burner servicemen to be appropriate based on separate supervision and the distinctness of primary functions and duties. *See also R.L. Stott Co.*, 183 N.L.R.B. 884 (1970) (oil burner and air conditioner servicemen and installers together constitute an appropriate unit); *NLRB v. Bayliss Trucking Corp.*, 432 F.2d 1025, 1028 (2d Cir.1970) (while enforcing a Board unit determination that included both drivers and servicemen based in part upon common supervision and a common history of collective bargaining, the court noted that separate units might also have been appropriate).

In addition, the Regional Director's decision specifies his bases for concluding that the unit of oil burner servicemen was appropriate. *See* Appendix at 240 (separate supervision, little work overlap, little interaction with other employees, substantially separate functions, and no labor union seeking to organize other employees). The analysis, while brief, is not conclusory and is supported by a two-page statement of facts. The Board had no obligation to reiterate these findings and rationale. We reject the company's suggestion that the Board's review is rendered conclusory by the adoption of the findings below.

Having reviewed the record, we also think there was substantial evidence to support the Board's conclusion that oil burner servicemen share a separate community of interests. The evidence indicated that there was little cross-over of duties between servicemen and the other classifications. Clerical employees work in the office and perform functions such as bookkeeping, billing, and paperwork on delivery, service and installations. Servicemen, on the other hand, spend only approximately 30–45 minutes of each day in the office; the balance of their time is spent on the road or at the sites they are servicing. Servicemen install, maintain and repair oil burners on both a routine and emergency basis. Oil drivers also spend considerable time out of the office. Their regular duties, however, are limited to delivering fuel. Unlike drivers, servicemen take their trucks home with them during the evening.

Oil burner servicemen are separately supervised by Everett Miranda, while other workers are under the direct supervision of George Nightingale. Servicemen also possess licenses and skills not held by other employees. They must pass a test before being licensed by the state of Massachusetts, and only licensed individuals may perform oil burner service and installation work. No clerical is licensed to perform any service functions. Although there was evidence that drivers had in the past pursued training and become certified as servicemen, oil drivers are not required to be licensed as servicemen.

George Nightingale testified that one time in the last six months a serviceman drove an oil truck and that drivers assist servicemen in the slow summer months. The company insists that this constitutes an adequate interchange of duties to make a unit of servicemen that excludes drivers inappropriate. But temporary interchange will not destroy a separate community of interests. *See Stott*, 183 NLRB at 885 (assistance during the summer months by drivers will not destroy the community of interests of oil burner and air conditioner servicemen). Moreover, there was evidence that drivers frequently are hired on a seasonal basis and annually leave Nightin-

gale for summer jobs at the end of the heating season. For these drivers, even temporary interchange will be unlikely.

Nightingale also claims that the pay scales of all employees are similar. There is, however, evidence to the contrary. While there is some similarity in the pay scales of drivers and servicemen, and while all employees receive the same benefit package, servicemen also regularly receive overtime and on-call premiums. Moreover, even if pay scales are similar, that fact would not require all employees to be included in a single unit. Under the community of interests standard, "no single factor alone [is] determinative." *Friendly Ice Cream*, 705 F.2d at 576.

We have recited ample record evidence supporting the Board's finding that oil burner servicemen have a separate community of interests and therefore constitute an appropriate unit. The company has failed to meet its burden of demonstrating that this designation was "clearly inappropriate." *See Friendly Ice Cream*, 705 F.2d at 574; *Banco Credito y Ahorro Ponceno v. NLRB*, 390 F.2d 110, 112 (1st Cir.1968).

*The petition for review is denied and the Board's bargaining order is enforced.*